UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **ELENA L. HUGHEY**, | Case No. 6:15-cv-01432-KI |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| **CAROLYN W. COLVIN, Acting Commissioner of Society Security**, | |
| Defendant. | |

        James W. Moller
        8655 SW Citizens Dr., Ste. 104
        Portland, OR 97070

                Attorney for Plaintiff

        Billy J. Williams
        United States Attorney
        District of Oregon
        Janice E. Hebert
        Assistant United States Attorney
        1000 SW Third Ave., Ste. 600
        Portland, OR 97204-2902

Page 1 - OPINION AND ORDER

Justin L. Martin
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Ste. 2900 M/S 221A
Seattle, WA 98104-7075

    Attorneys for Defendant

KING, Judge:

Plaintiff Elena Hughey brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying her applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"). I affirm the decision of the Commissioner.

## BACKGROUND

Hughey protectively filed applications for DIB and SSI on July 5, 2011, alleging disability beginning March 26, 2011. The applications were denied initially and upon reconsideration. After a timely request for a hearing, Hughey appeared and testified before an Administrative Law Judge ("ALJ") on October 1, 2013, without the representation of counsel.

On December 3, 2013, the ALJ issued a decision finding Hughey not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review the decision of the ALJ on May 28, 2015.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or

mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

PAGE 3 - OPINION AND ORDER

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. *Parra*, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. *Id.* (internal quotation omitted). The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. *Id.*

## THE ALJ'S DECISION

Hughey had obesity, sleep apnea, and status post total knee replacement surgery according to the ALJ. These impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. As a result, the ALJ concluded Hughey retained the residual functional capacity ("RFC") to perform less than the full range of sedentary work. Specifically, she could occasionally stoop, crouch, kneel, crawl, and climb ramps and stairs; she should never climb ladders, ropes or scaffolds; she was limited to frequent balancing; she needed to avoid concentrated exposure to temperature extremes, vibrations, and fumes, dust, gasses, poor ventilation, and other noxious odors; and she needed to avoid more than occasional exposure to heights, moving machinery, and similar hazards.

Given this RFC, the ALJ concluded Hughey could return to her past relevant work as a night auditor and customer service representative/telemarketer. Thus, Hughey was not disabled within the meaning of the Act.

## FACTS

Hughey was 50 years old on her alleged disability onset date. She had a high school degree, had worked as a nurse assistant, in housekeeping and at the front desk for several different motels, and most recently at Walmart.

Hughey had breast cancer in 1995 and again in 2005, resulting in a bilateral mastectomy. She continued to take tamoxifen given her family history of breast cancer.

PAGE 5 - OPINION AND ORDER

Hughey had her left knee replaced in 2009. She began experiencing painful symptoms in her right knee[1] and explored the possibility of a right knee replacement in early 2011. After her surgery in April, she was "pretty miserable," feeling side effects from her medications, barely able to walk, and reliant on a wheelchair. Tr. 477. She reported better pain control in June. Her orthopedist, Michael McLean, MD, noted satisfactory range of motion, full extension, and flexion limited only by her thigh. He told her the swelling and discomfort was to be expected. He approved her medical leave from work.

A few weeks later, her doctor, Geraldine Somera, MD, confirmed Hughey needed oxygen at night due to nocturnal hypoxemia. Dr. Somera speculated Hughey may also have obstructive sleep apnea due to her obesity and referred her for a sleep study. The doctor identified some edema in Hughey's legs, but thought it looked relatively stable.

Dr. McLean again noted Hughey was "doing fairly well" in July. Tr. 405. She continued to use pain medication and a walker, and complained of swelling. The doctor found mild swelling in the right ankle and foot. He commented that Hughey "was not doing as well as I would like but considering her size and passivity, I think is about as what we can expect." Tr. 406. Hughey requested an extension of her medical leave. Dr. McLean told her he typically gives only three months, but he would try for one more month. He noted he would not give her any more time after that.

Hughey returned to Dr. Somera's office in August with a concern about lower leg swelling, reporting that her legs became red, hard and painful. On examination Diane Smith,

---

[1]She experienced joint pain for nearly all of 2010, prior to her alleged disability onset, and told her oncologist that she wanted Social Security disability income so that she could "retire and quit working. She cannot find a doctor to sign her forms for her." Tr. 330.

NP-PP, identified mild edema, antalgic gait, and the need to use a wheeled walker. Hughey was told to ice her right knee four times daily and elevate her feet when possible. She was also told to purchase compression stockings, which Hughey could not afford. The nurse applied an Ace wrap instead.

In mid-August, Hughey had not worn compression stockings, she felt the Ace wrap was ineffective, and her prescription for Lasix did not seem to help. She reported painful swelling in her feet that made it difficult to walk. She felt she could not return to work. She walked with a cane.

Anton Lotman, M.D., confirmed Hughey's obstructive sleep apnea and her need for oxygen at night. He recommended considering a CPAP.

Hughey told Smith in September 2011 she was no longer working at Walmart "because she feels her health issues preclude her from working." Tr. 461. Dr. Lotman ordered the CPAP for Hughey the following week for her moderately severe obstructive sleep apnea.

Hughey reported headaches and falling down to her oncologist Bret Cook, M.D., but otherwise she reported doing "reasonably well." Tr. 457. Hughey's gait was steady, she had no problems with balance, nor any weakness in any extremity. She had no anxiety, difficulty sleeping or depression. Dr. Cook scheduled her for an MRI. At the end of December, at an appointment with Susan Ault, MSN, FNP, from Dr. Cook's office, Hughey walked with an antalgic gait using a cane. She had full range of motion impeded only by her weight. She was weak, with decreased endurance and deconditioning. MRI of her brain was negative. Both her feet were swollen. She reported anxiety, fatigue, and depression.

PAGE 7 - OPINION AND ORDER

Gail Wahl, PhD, examined Hughey at the agency's request on December 30, 2011. Hughey declined to talk about her childhood. She lived with her husband and their adult daughter. She said she would recommend knee surgery to anyone as she was in much less pain afterward. She took Dilantin for seizures, but had not had a seizure for 30 years, and took Lexapro for depression ever since being diagnosed with cancer. She felt it helped a lot. She appeared very overweight with edema in her legs. She spent her days watching television, working around the house, and cooking. She rarely drove after having been diagnosed with sleep apnea. She shopped, with the help of her daughter. She took care of her own grooming, with occasional help from her daughter. She used a walker. Her affect was appropriate, although angry. Her social skills were appropriate and she was cooperative. Dr. Wahl diagnosed depressive disorder, NOS. The doctor identified no problems with understanding and remembering instructions, with concentration, attention, or persistence, with social interaction, or with adaptive skills.

Dr. Somera saw Hughey again in January 2012. She reported doing well with her right knee, with just p.r.n. pain medication. Dr. Somera observed mild edema in Hughey's legs, unchanged from baseline.

Hughey fell out of a chair in early February 2012 and went to the hospital concerned about a rib fracture. She obtained a prescription for Fentanyl and Norco. A chest x-ray showed no obvious rib fracture, but she was diagnosed with an occult rib fracture (one that could not be detected by x-ray).

Hughey told Dr. Lotman later that month that the CPAP controlled her snoring, and she did not report any daytime sleepiness or drowsiness. She felt short of breath during the day

which Dr. Lotman thought might be due to her rib fracture. A spirometry test showed a "mild" decrease in diffusing capacity, but her lung volumes were within normal limits. Tr. 501.

Hughey told Dr. Somera about increased anxiety and headaches in mid-April 2012. She inquired about changing her prescription from Lexapro to something else for anxiety. Dr. Somera prescribed fluoxetine, ordered an overnight pulse oximetry test to determine whether her headaches were brought on by nocturnal hypoemia, and ordered a head CT to rule out other headache causes. The CT of her brain was negative.

Hughey continued to complain to Ault of anxiety, depression, and fatigue. She exhibited a full range of motion in her extremities, although she was weak with decreased endurance and deconditioning. She walked with an antalgic gait using a cane.

In May, Dr. Lotman noted Hughey's use of the CPAP helped her and reduced her daytime fatigue and drowsiness. When Hughey met with Dr. Somera that same month, she reported her anxiety had decreased with the fluoxetine. She exhibited no edema. A month later, Hughey's anxiety had improved, her headaches had "definitely improved" with CPAP changes, and she exhibited no edema. In August 2012, Hughey again reported her depression and anxiety were better on the fluoxetine and busprione. Examination of her extremities was normal, with no edema.

However, at her oncology appointment with Ault two weeks later, on September 6, 2012, Hughey complained of malaise, fatigue, diffuse joint pain, leg weakness, and difficulty walking. She appeared morbidly obese, unkempt, tired, and older than her stated age. Examination of her extremities was abnormal, her gait was antalgic, she was tender in all areas (blaming

PAGE 9 - OPINION AND ORDER

fibromyalgia), and she appeared anxious, irritable, frustrated, depressed, sad, despairing, tearful and empty.  Tr. 548.  She admitted to lying in bed.

A month later, back with Dr. Somera, Hughey's depression and anxiety were relatively stable on fluoxetine and busprione.  She felt anxiety and mood swings but "these are better in general."  Tr. 538.  She reported no diffuse joint pain, no muscle aches, no back pain, no joint swelling, and examination of her extremities was normal.

Ault's notes in January 2013 mirror those she produced in September 2012, finding Hughey's extremities to be abnormal, tender in all areas (blaming fibromyalgia), and mood and affect to be abnormal.

Just three days later, Dr. Somera reported the swelling in Hughey's legs was under control for the most part, and her depression and anxiety were stable.  Hughey complained of some sleep problems, but she tried not to take daytime naps.  The doctor emphasized improved sleep hygiene and suggested trazodone.  On examination, Hughey reported leg and knee pain, but no joint pain, generalized muscle aches, and no limping; her legs appeared puffy but this was unchanged from baseline.  Hughey mentioned insomnia, but no irritability, anxiety, or depression.

Hughey started counseling sessions with Nancy Strain in May 2013.  She was given coping strategies and allowed to talk about her childhood trauma.  By September 2013, Hughey said her symptoms had been less severe, that she had visited her mother in Arizona and had a "wonderful time."  Tr. 589.

**DISCUSSION**

Hughey complains the ALJ failed to develop the record and neglected to address relevant evidence.

I.   Duty to Develop the Record

A Social Security ALJ has an "independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (internal quotation omitted). The duty is heightened if a claimant is unrepresented or is mentally ill and cannot protect her own interests. The ALJ must supplement the record if: (1) there is ambiguous evidence; (2) the ALJ finds that the record is inadequate; or (3) the ALJ relies on an expert's conclusion that the evidence is ambiguous. *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005). The supplementation can include subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow the record to be supplemented. *Tonapetyan*, 242 F.3d at 1150.

Hughey argues the ALJ should have inquired further at the hearing about how her conditions affected her ability to work. She testified that she could not work any longer due to her two knee replacements, the swelling in her feet, body aches from her cancer, and weak legs. She also mentioned her anxiety and her need for oxygen due to her COPD. She complains the ALJ should have asked specific questions about how these impairments affected her ability to work.

The record reflects that the ALJ inquired of Hughey for approximately forty minutes about all of her conditions. He asked her about the treatment she was receiving for her leg and

foot pain, as well as the medication and counseling she received for her anxiety. Hughey confirmed the counseling was helping "a little," although she testified the medication was not effective. He asked her about her daily activities and confirmed that Hughey spends four to five hours a day on the computer. She testified she could not squat, run and she could barely walk after the knee surgeries. She testified she needed to lay down during the day to deal with her pain.

The ALJ sufficiently developed the record and any further inquiry was unnecessary given the extensive record of Hughey's orthopedic, oncological, and mental health treatment. Indeed, at the end of the hearing the ALJ specifically asked about her mental health counseling records and left the record open in order for his office to obtain those records. The records were submitted, and he mentioned them in his summary of the medical record. *See* Tr. 19 (Hughey "attended therapy to treat her symptoms.").

The ALJ fulfilled his duty to develop the record. *Tonapetyan*, 242 F.3d at 1150.

II.     Residual Functional Capacity

Hughey argues that even a limitation to sedentary work fails to account for all of her physical limitations. She suggests, for example, that her fatigue would require daytime naps and resting in a reclined position. She contends the ALJ did not consider her lack of improvement after her right knee surgery, as even Dr. McLean mentioned, nor did the ALJ discuss Ault's observations about Hughey's fatigue, pain, ambulation problems, as well as her depression and anxiety. Finally, she argues the ALJ did not mention her therapy sessions with Strain.

With respect to Hughey's fatigue, the ALJ observed that Hughey had reported "improvement of her daytime fatigue and drowsiness with treatment." Tr. 22. Other than

Hughey's testimony, the rejection of which is not challenged here, the record reflects the CPAP improved her fatigue and drowsiness, that she was working on sleep hygiene, and she was trying not to take daytime naps. She fails to identify any evidence substantiating the functional limitations she claims to have as a result of daytime fatigue. An ALJ is not required to incorporate limitations that are not supported by substantial evidence. *Osenbrock v. Apfel*, 240 F.3d 1157, 1164-65 (9th Cir. 2001).

Further, contrary to her assertions of continued knee pain and lack of improvement, Dr. McLean's treatment notes indicate her knees were stable and she had good range of motion after each surgery; he declined to approve further time off after her right knee replacement. Dr. McLean did express disappointment that Hughey had not recovered faster, but he attributed it to her size and passivity. By January 2012, Hughey was taking pain medication only as needed. She told Dr. Wahl in December 2011 that she would recommend knee surgery to anyone. The ALJ also limited Hughey to sedentary work to account for any knee-related limitations.

Hughey insists the ALJ should have sought a functional analysis from Hughey's treating providers. The ALJ does have an affirmative duty to assist the claimant in developing the record "when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). Neither is the case here. Both her orthopedist and her treating physician repeatedly noted satisfactory range of motion and full extension after her knee replacements, Dr. McLean specifically discouraged Hughey from taking more time off from work, her leg swelling decreased over the course of several months, Hughey said she would recommend knee surgery to anyone, she was taking pain medication only as needed, and she retained the ability to perform chores around the

house and go shopping.  The evidence was sufficient to make a finding limiting Hughey to sedentary work.

Although Ault, in Hughey's oncologist's office, observed on four occasions (December 2011, April 2012, September 2012, and January 2013) that Hughey complained of fatigue, anxiety and depression, demonstrated an antalgic gait, and complained of diffuse joint pain and tenderness all over, the ALJ did not address or reference these notes.  Nevertheless, the ALJ need not "discuss all evidence presented to [him].  Rather, [he] must explain why significant probative evidence has been rejected." *Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per curiam) (internal quotation and citation omitted).  Ault's notations are neither significant nor probative as they are not functional findings, they come from Hughey's oncologist's office, they directly contradict the repeated observations made by treating physician Dr. Somera, and they are inconsistent even with Hughey's own comments to Dr. Somera and to Dr. Wahl.  As a result, the ALJ did not err in failing to reference Ault's notes.

Finally, Hughey's therapy sessions with Strain, which the ALJ specifically mentioned in his summary of the medical record, only support the ALJ's conclusion that Hughey's anxiety and depression were adequately treated with medication and therapy.  Specifically, the treatment notes reflect Hughey gained insight into her symptoms, learned coping mechanisms, slept better, and was able to have a "wonderful" visit with her mother in Arizona.  As a result, the ALJ did not err in failing to summarize these notes in more detail.  *See id.* (requiring discussion of significant probative evidence); *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006) (any error in failing to discuss this evidence was harmless where reasonable ALJ could not have reached a different disability determination).

PAGE 14 - OPINION AND ORDER

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this       1st       day of September, 2016.


                                                /s/ Garr M. King
                                              Garr M. King
                                              United States District Judge